[No. 2913.   June 8, 1926.   Rehearing Denied Oct. 5, 1926.]

## STATE v. CLEMENTS.

[249 Pac. 1003.]

### SYLLABUS BY THE COURT

1. In a capital case, failure of the accused to move for a directed verdict does not necessarily preclude review of the evidence on appeal.

2. The trial court having found that in fact there was no tampering with the jury, no question of law is presented.

3. A remark of the district attorney in address to jury, incomplete because interrupted by objection, which remark, if completed, might or might not have constituted comment on failure of the accused to testify, held no ground for new trial.

---

[1] 17CJ p. 72 n. 65; 30CJ p. 312 n. 42.   [2] 17CJ p. 252 n. 15.   [3] 16CJ p. 1143 n. 6.   [4] 17CJ p. 267 n. 93, 94, 95, 96, 97, 98.   [5] 16CJ p. 1081 n. 92; p. 1162 n. 41; p. 1163 n. 50.

## On Rehearing.

4. The rule that a verdict in a criminal case will not be set aside if supported by substantial evidence is not varied by the fact that the evidence was circumstantial.

5. The presumption of prejudice from an unauthorized and improper communication between a juror and an outsider may be rebutted, and if it satisfactorily appears that such communication was not prejudicial, a new trail should not be granted.

Appeal from District Court, Rio Arriba County; Holloman, Judge.

Price Clements was convicted of first degree murder, and he appeals. Affirmed.

Renehan & Gilbert and E. P. Davies, all of Santa Fe, for appellant.

J. W. Armstrong, Atty. Gen., James N. Bujac, Asst. Atty. Gen., and J. J. Kenny, Asst. Dist. Atty., of Santa Fe, for the State.

### OPINION OF THE COURT

WATSON, J. Price Clements appeals from a capital sentence on conviction of murder in the first degree for the killing of Clay Carpenter in Rio Arriba County.

In January, 1922, the bodies of Frank Akin and Clay Carpenter were discovered in an arroyo back of an unoccupied cabin. Clay Carpenter's death was caused by a gunshot wound in the head, a large caliber bullet striking him on the left side of the occipital protuberance. Akin's body showed that he had been struck on the left temple with a blunt instrument, fracturing the skull and inflicting a necessarily immediately fatal wound. He had also been shot on the right side of the head with a large caliber bullet. This wound was fatal, but not necessarily immediately so. Tracks in the snow and conditions inside the cabin indicated that one of these men had been slain in the cabin and dragged out the door around the cabin to the arroyo, where he was found, and that the other had been killed in front of the cabin, near a place where an automobile had stood, and dragged to the place where found. In the arroyo,

some distance from either of these bodies, was found a large bucket containing bloody snow, which, apparently, had been placed there by the person who had disposed of the bodies. There was some evidence about the scene of the homicides of an attempt to remove the traces thereof.

On the evening of the day of the homicides, appellant appeared at El Vado, some 12 miles distant. There he left with a state's witness a number of articles, selling some for a few dollars, and apparently simply leaving others. Among these articles were some identified at the trial as Carpenter's. He exchanged with this witness a rifle and a 45-caliber pistol for a 32-caliber pistol. The 45-caliber pistol exchanged contained two loaded and two empty cartridges. Among the articles left was a shovel with blood on the handle and blade. Appellant also left with the witness a Ford car, to be cared for until he should return in April or May.

After making these arrangements, defendant went to Lumberton, Pueblo, Colorado, Dodge City, Kansas, and finally to Matador, Texas, where he was apprehended. He waived extradition, and returned in custody of the sheriff of Rio Arriba county. On that trip from Matador, appellant related to the sheriff his version of the double homicide, which we quote from appellant's brief:

"Clements was standing in the doorway of the cabin after breakfast looking out at the time of the tragedy. Akin was sitting on the bench near the wall beside the breakfast table, while Carpenter was sitting on a stool near the stove. Carpenter and Akin commenced quarreling about a poker game in which they had lost heavily. They had been gambling at a nearby lumber camp. The quarrel became heated finally, and words led to blows, and ended by Carpenter grabbing a pickax which was in the cabin and striking Akin in the head. Akin fell forward on the table and then to the floor. At the sound of the blows Clements turned and cried, "My God, Clay; what have you done?" Carpenter, with an oath, yelled, 'I'll get you, too!' At this Clements grabbed a revolver from the table, and Carpenter reached back to the bunk and got a rifle which was lying on the top of the bedding (thus doubtless making the smear of blood found on the bedding). Clements ran out of the door and got behind the auto, while Carpenter

followed with the rifle, swearing and saying that Clements could not get away from him. For a time Carpenter and Clements dodged back and forth around the auto, and then, being on opposite sides, Clements stooped and looked under just in time to see Carpenter looking under from the opposite side. Quick as a flash Clements jumped to the running board and kneeled there with the body of the car between them. After a moment he peeked over the side of the car and saw Carpenter's rifle barrel come up and then his head as Carpenter arose from a kneeling position. As Carpenter's head came in view, Clements fired and Carpenter stumbled and fell. Clements, then a boy of about 22, overcome by fear, dragged the bodies of the two men to the arroyo behind the cabin, took such money as they had, between $150 and $170, jumped in the auto and fled. Clements only had $2 or $3 of his own, and took the money from the bodies to get away with."

It is appellant's first contention that the evidence was insufficient to warrant the verdict, or to warrant submission to the jury. The conviction rests entirely upon appellant's statement, to which the sheriff testified, and upon circumstances appearing in evidence. Appellant contends that there is remarkable correspondence between these circumstances and appellant's statement of what took place; that as the statement was exculpatory, the state was bound to prove its falsity; and that the proof of appellant's guilt, as distinguished from the fact of the killing, must be found, if at all, in the physical facts and circumstances.

[1] The state points out that appellant made no motion for a directed verdict, announced himself as satisfied with the proposed instructions later given by the court, and, although he made a motion for a new trial, failed therein to raise the point now urged. State v. Garcia, 19 N. M. 414, 143 P. 1012, is cited to the proposition that, under such circumstances, appellant cannot, in this court, obtain a review of the evidence. It was so held in the original opinion. On rehearing, however, it was decided that this court has the inherent power "to see that a man's fundamental rights are protected," even though he is not in a position to claim them as a matter of legal right. It there appeared not only that there was no substantial evidence to support conviction, but that innocence was actually and affirm-

atively disclosed. Therefore the inherent power was
exercised and a new trial granted. If the same were
true in this case, the precedent would require a new
trial. In definition or limitation of the inherent power
to protect the fundamental rights of accused persons,
this court said in the Garcia Case:

· "The restrictions of the statute [Laws 1917, c. 43, § 37]
apply .to · the parties, not to this court. This court, of
course, will exercise this discretion very guardedly, and
only where some fundamental right has been invaded, and
never in aid of strictly legal, technical, or unsubstantial
claims; nor will we consider the weight of evidence if any
substantial evidence was submitted to support the verdict.
If substantial justice has been done, parties must have
duly taken and preserved exceptions in the lower court
to the invasion of their legal right before we will notice
them here."

In view of this doctrine, we are not prepared to hold
with the state that a review of the evidence in a capital
case should be refused because of the failure to present
to the trial court the question of its insufficiency. Hav-
ing reviewed it and having found it sufficient, there
is no occasion to apply, extend, or limit the rule of the
Garcia Case.

The jury necessarily tested appellant's story by the
circumstances shown. Among these were flight, taking
a considerable sum of money from the bodies, conceal-
ment of the bodies, attempts to remove evidences of
the crime, and disposing of the weapon with which the
jury might have found both homicides to have been
committed. It will be noted that appellant's explana-
tion, as above quoted, fails to mention the gunshot
wound in Akin's right temple. It was, however, brought
out on cross-examination of the sheriff that just as
Carpenter was leaving the cabin in pursuit of appel-
lant, there was a shot, which appellant supposed to
have been accidental. There is no other way, under
appellant's version of the facts, to account for this
wound. It was the state's theory that Akin was shot
before he was struck with the blunt instrument. This
theory was supported by the expert testimony of a
physician, not in any way rebutted. The jury had a

clear right to believe the state's theory in regard to this, and it was inconsistent with that of the defense. Appellant testified that he fired but one shot. In the pistol which he disposed of on the day of the homicide there were two empty shells. Thus there were circumstances from which the jury might draw inferences of guilt, and there was evidence which, if believed by the jury, would demonstrate that appellant had not truthfully accounted for the killing of Akin. He was admittedly there, and if his story of the occurrences was false, the jury was justified in convicting him as it did.

Appellant urges two further grounds for reversal, both of which were set up in a motion for new trial and overruled by the court. The first of these grounds is alleged tampering with the jury, and the second is misconduct of the assistant district attorney in argument.

[2] In support of the charge of tampering with the jury, three affidavits were submitted to the effect that after the jury had retired to consider its verdict a person referred to as "the prosecuting witness," although he did not testify in the case, entered the room at the hotel, where the jury was, and remained four or five minutes. One of these affidavits contains the assertion that during a recess in the trial this same person conversed apart with one of the jurors, unnamed, about 20 minutes. The state presented the counter affidavit of the person referred to, in which he expressly denied any conversation with the jury or any member thereof after retirement of the jury to consider its verdict. This affidavit the court evidently construed as a denial of the other incident, although the language used is somewhat equivocal. Upon this point the court, in ruling upon the motion, found as follows:

"That as to the charge in the motion for a new trial that jurors were permitted to talk with and did talk with P. H. Hill, both before and after retiring to deliberate on their verdict herein, the court certifies that the state has filed the affidavit of P. H. Hill in which he denies said charge in toto, and, considering the affidavits filed in said

matter upon said point and all the circumstances surround-
ing the said trial, and in view of the fact that no attempt
is made to set up any statement made by said P. H. Hill
to show whether or not he did make any statement which
was prejudicial, the court cannot find, and does not find,
that said P. H. Hill did talk to said jury, or any member
thereof, at any time after the beginning of said trial."

Considering this, as we must, as a finding against the
truth of the charges made, no question of law would
seem to be presented, and appellant's contention must
be overruled.

[3] In his argument to the jury, the assistant dis-
trict attorney made this incomplete remark:

"We are sorry that the jury does not have the benefit
of the defendant's explanation—"

At this point he was interrupted by the objection of
appellant's counsel, and admonished by the court not to
proceed along that line, and the jury was instructed to
disregard the remark. It is here urged, as on the mo-
tion for new trial, that this was a comment by the as-
sistant district attorney upon the failure by the appel-
lant to take the stand in his own behalf, and constitutes
reversible error, incapable of being cured by anything
that the trial court did or could do. Counsel cite Code
1915, § 2166, which provides:

"In the trial of all indictments, informations, complaints
and other proceedings against persons charged with the
commission of crimes, offenses and misdemeanors in the
courts of this state, the person so charged shall, at his
own request, but not otherwise, be a competent witness;
and his failure to make such request shall not create any
presumption against him."

They also cite many cases in support of their con-
tention. In our view, the principles of the cases cited
are not here involved.

It appears from the court's ruling on the motion for
new trial that the assistant district attorney was at the
time discussing and criticizing appellant's version of
the facts as it appeared in the testimony of the sheriff.
That would seem to have been an entirely proper sub-
ject of discussion before the jury. The appellant hav-

ing made a statement to the sheriff, it was proper in
argument to test its truth by inquiring whether it was
in harmony with the circumstances.   The remark of
the assistant district attorney, as far as it had proceed-
ed, is entirely consistent with an intent to continue the
discussion of appellant's testimony vicariously before
the jury.   He said nothing which, under the circum-
stances, indicates any intention to refer in any manner
to the fact that appellant, instead of taking the stand in
his own behalf, rested content with the testimony of
the sheriff.   The assistant district attorney, by counter
affidavit used in connection with the motion for new
trial, says that he intended to complete the sentence
in these words:

"—of the wound in the right side of Akin's head."

We refer to this, not because the particular intent
of the assistant district attorney is determinative of the
question of error, but as illustrating that it would have
been perfectly possible, under the circumstances, to
complete the remark without any improper reference
to appellant's failure to testify.

It would be going far indeed to grant a new trial
under such circumstances, particularly in view of the
fact that no actual prejudice to the appellant is shown.
We do not hold that, if there had been comment on
appellant's failure to testify, it would have been neces-
sary to show prejudice to obtain a new trial.   We do
not consider the question.   We do hold that, before the
question can arise, it must appear that there was such
comment.   Counsel cannot seize upon an incomplete
remark which may or may not have reference to appel-
lant's failure to testfiy, put their own interpretation
upon it, and claim a reversal.   In such a case it does
not appear necessarily as misconduct of the assistant
district attorney.   Whatever effect the colloquy may
have had on the jury counsel are themselves responsible
for.   While courts have gone to considerable lengths to
prevent comment on the failure of an accused person
to testify in his own behalf, no case similar to this has

been brought to our attention; nor can we, upon any principle urged, or with which we are familiar, sustain appellant's present contention.

Having found no error, and being satisfied that the appellant had a fair trial and that the verdict is supported by substantial evidence, the judgment must be affirmed.

It is so ordered.

PARKER, C. J., and BICKLEY, J., concur.

On Rehearing.

WATSON, J. It is first urged that, in passing upon the sufficiency of the evidence to support the 'verdict, we overlooked that this conviction is based upon circumstantial evidence, and that in such a case the circumstances must be such as, if believed, exclude every reasonable hypothesis except that of guilt.

The trial court instructed the jury that the prosecution relied upon circumstantial evidence to convict, and that therefore, "before you will be authorized to find a verdict of guilty in this case, the facts and circumstances shown in evidence must be incompatible, upon any reasonable hypothesis, with the innocence of the defendant, and incapable of explanation upon any reasonable hypothesis other than that of the guilt of the defendant." Hence there can be and is no objection to the manner in which the case was given to the jury. The objection is that it was for this court, as a matter of law, to conclude that the circumstantial proof did not meet the requirements of the instruction properly given. Such is not the law governing the review of criminal verdicts.

In any criminal case the proof must satisfy the jury beyond a reasonable doubt of the defendant's guilt. Otherwise he must be acquitted. The jury must be so instructed. Yet the principal inquiry of this court in reviewing the evidence is directed to the question whether it substantially supports the verdict. The

weight of the evidence—whether it proved guilt be-
yond a reasonable doubt—is for the jury to decide.
These principles are well understood, and no authorities
need be cited.

[4] The rule in a circumstantial evidence case is
but a special application of the general rule of reason-
able doubt. The jury having been properly instructed
as to the defendant's rights, its decision is final if sup-
ported by substantial evidence. The rule is thus stated
at 17 C. J. 267:

"The fact that the evidence is circumstantial and con-
flicting does not alone empower the appellate court to
weigh it or determine its sufficiency, if it reasonably tends
to prove the guilt of the accused and fairly warrants a
conviction. A verdict based on circumstantial evidence
carries the same presumption of correctness as other ver-
dicts, and will not be disturbed unless wholly unwarranted,
even though the evidence is weak and unsatisfactory to the
appellate court. But mere suspicion raised by the cir-
cumstances proved will not sustain a conviction, especially
when such suspicion is removed by uncontradicted evidence;
and when the circumstantial evidence relied on does not
carry with it a reasonable certainty of guilt a reversal
will follow."

The following cases which we have examined support
the text: Richardson v. State, 56 Ark. 367, 19 S. W.
1052; People v. Martinez, 20 Cal. App. 343, 128 P. 952;
Buckine v. State, 121 Ga. 337, 49 S. E. 257; Sanderson
v. State, 169 Ind. 301, 82 N. E. 525; State v. Rains-
barger, 74 Iowa, 196, 37 N. W. 153; Minniard v. Com-
monwealth, 158 Ky. 210, 164 S. W. 804; Browning v.
State, 33 Miss. 47; Samples v. State, 10 Okl. Cr. 102,
134 P. 838; State v. Wideman, 68 S. C. 119, 46 S. E.
769; Morris v. State (Tex. Cr. App.) 39 S. W. 934;
McCune v. Com., 2 Rob. (Va.) 771; Schwantes v. State,
127 Wis. 160, 106 N. W. 237; Cannon v. State, 17 Ala.
App. 82, 81 So. 860; State v. Brown, 114 Kan. 699, 220
P. 175.

We cannot say that the circumstances proved in this
case did not warrant the jury in reaching the verdict
it did.

[5] In disposing of the charge that the jury had

been tampered with, we accepted the finding of the trial court against the truth of the charges made, although we characterized the affidavit denying the charges as somewhat equivocal. It is now urged that, as the evidence upon which the court's finding was based was entirely documentary, the finding was not binding upon us; but that it was our duty, from the evidence, to determine the truth of the charges. A careful re-examination of the affidavit in question discloses that, while there is an unequivocal and express denial of any conversation of any kind, with any juror, after the submission of the case and the retirement of the jury to consider its verdict, the sworn allegation on behalf of the appellant to the effect that a private conversation of about 20 minutes' duration took place between a juror, unknown, and the third person named, during a recess in the trial, was denied only in this language:

"Affiant utterly negatives and denies any conversation, at any time, with any juror or jurors, in relation to the then pending case."

In so far as the findings of the trial court are supported by substantial evidence, we accept and act upon them. We must admit, however, that we can find no substantial evidence to support the finding that there was no communication. The effect of the counter affidavit seems to be that a conversation of some kind, with one of the jurors, did in fact take place, but that it had no reference to the case being tried. P. H. Hill, who thus seems to admit having his communication with a juror, was a deputy sheriff, more or less concerned in the apprehension and prosecution of the appellant, but denying any prejudice against him.

It is needless to point out that this is a regrettable occurrence. We doubt not that the trial court, had he viewed the facts as we are constrained to view them, would have visited proper punishment upon those who thus trifled with the dignity and authority of the court in a manner to threaten a miscarriage of justice.

Counsel for appellant suggest, without reference to texts or cases, that, by weight of authority, even a technical separation of the jury in a capital case will necessitate setting aside its verdict. As to this subject in general see valuable case notes in 43 Am. Dec. 83, 1 Ann. Cas. 287, 34 A. L. R. 1115. We are not prepared to admit the point, but need not determine it, as counsel concede that, since State v. Blancett, 24 N. M. 433, 174 P. 207, the law in this state is otherwise. In the Blancett Case it was held that a separation of one of the jurors from the others is not ground for a new trial, unless it appears that the defendant was prejudiced thereby. It is the latest of a line of decisions in this state and in the territory liberalizing the early strict rule as to separation in criminal cases. Territory v. Nichols, 3 N. M. (Gild.) 103, 2 P. 78; Territory v. Chenowith, 3 N. M. (Gild.) 318, 5 P. 532; Territory v. Edie, 6 N. M. 555, 30 P. 851, on rehearing 7 N. M. 183, 34 P. 46; Roper v. Territoy, 7 N. M. 255, 33 P. 1014; United States v. Swan, 7 N. M. 306, 34 P. 533; United States v. Spencer, 8 N. M. 667, 45 P. 715; United States v. Cook, 15 N. M. 124, 103 P. 305; State v. Starr, 24 N. M. 180, 173 P. 674. Of these decisions United States v. Swan and United States v. Spencer are perhaps inharmonious with the others. They are so at least as to the statement of the rule.

The case before us, however, is not one of mere technical separation, as the result of which there may have been unauthorized and improper communication. between jurors and others. Such a communication seems to have occured, and we must apply the rules controlling in such cases.

In Territory v. Edie, supra, there was a communication between the foreman of the jury and a deputy sheriff. The latter, at the former's request, while separated from the other jurors, wrote the verdict. Viewed technically, there could be no more dangerous communication. It not only related to the case upon which the jury was deliberating, but the jury's conclusion upon the case was written by and put in the language

of an outsider.  The court thus disposed of the matter:

"It does not appear, nor is it claimed, except in argument, that the form so written had anything to do with the result of the jury's deliberations.  Whilst it is an irregularity, censurable in the highest degree, the extreme rigor with which it was visited under the ancient rule has been considerably relaxed in modern practice.  It is now almost universally established that, unless it appears that such interference takes place for some corrupt or sinister purpose, or that such conduct has been prompted by the parties and has resulted injuriously to one of such parties, the verdict will not be disturbed, either in civil or criminal cases.   2 Grah. & W. New Trials, 317; People v. Boggs, 20 Cal. 435; People v. Symonds, 22 Cal. 352.    It not appearing that the defendant's rights were either impaired or imperiled by such irregularity, we cannot hold it error solely on ' eloquent counsel's vivid portrayal of the grave injustice. that may. sometimes result from such misconduct."

On the rehearing, it was urged that the rule of decision thus stated was in irreconcilable conflict with Mattox v. United States, 146 U. S. 140, 13 S. Ct. 50, 36 L. Ed. 917.  O'Brien, C. J., writing the opinion, admitted that "the language chosen by us to express the rule may not be faultless."  It was decided, however. that the same result would follow adoption of the rule of the Mattox Case, viz.:

"Private  communications,  possibly  prejudicial,  between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear."

The dissent by Seeds, J., concurred in by Fall, J., expresses the view that the rule originally announced was then "in consonance with the great weight of authority," but that it is not the law of New Mexico, because of the Mattox decision by the Supreme Court of the United States; the difference in the two rules being that one "throws the burden upon the territory to prove the acts done not prejudicial, they being assumed to be such," while "the other casts the burden upon the accused to prove the acts injurious or prejudicial to him." The opinion of Chief Justice O'Brien is interesting because of the free and forcible expression of his views as to the rule best adapted to meet the ends of

justice under the conditions then prevailing in New Mexico.

Thompson says (Trials, §§ 25-33):

"A communication explained and apparently harmless and innocent will not vitiate the verdict, but an unexplained communication, possibly prejudicial, will avoid it."

At 16 C. J. 1081, it is said:

"It has been held that it is not misconduct which will vitiate the verdict for jurors to communicate with outsiders where nothing is said about the case."

Speaking of communications occurring while the jury is engaged in deliberation, Wharton says (Crim. Proc. §§ 1665-1778) that, according to the better opinion, they are not to be presumed without influence upon the verdict, and constitute ground for a new trial; but that if such communications do not touch the subject-matter of the trial, the rule is otherwise. These statements of the law find general support in Coats v. State, 101 Ark. 51, 141 S. W. 197; Mansfield v. Commonwealth, 163 Ky. 488, 174 S. W. 16; State v. Robertson, 133 La. 806, 63 So. 363; State v. Oteri, 128 La. 939, 55 So. 582, Ann. Cas. 1912C, 878; State v. Goodson, 116 La. 388, 40 So. 771; Taylor v. State (Miss.) 30 So. 657; Commonwealth v. Lombardi, 221 Pa. 31, 70 A. 122; State v. Cotts, 49 W. Va. 615, 39 S. E. 605, 55 L. R. A. 176; Zinn v. State, 135 Ark. 342, 205 S. W. 704; State v. Harris, 12 Nev. 414; Pope and Jacobs v. State, 36 Miss. 121.

In People v. Newell, 192 Cal. 659, 221 P. 622, the district attorney engaged in casual conversation with a juror, in the corridor outside the courtroom, during a recess, in plain view of bystanders. He having denied "that he had mentioned the case or the panel of jurors to the jury," the Supreme Court said:

"Upon the showing made, it is manifest there was no foundation for the asserted misconduct, and the court properly declined to take any action."

In People v. Mayen, 188 Cal. 237, 205 P. 435, 24 A. L. R. 1383, the rights of the defendant were held not

"prejudicially affected by the alleged misconduct of one of the jurors by reason of a passing conversation with a member of the grand jury, during the trial, who was in the courtroom at one of the adjournments, in which the grand juror remarked that he was a member of the grand jury and interested in the case."

In People v. Emmons, 7 Cal. App. 685, 95 P. 1032, three several occurrences were relied upon. One of them was that "one of the jurors was seen talking with some one not a juror in the hallway of the courthouse, and that he was heard to say: 'Well; ask him.'" The court, while giving the explanation of the harmlessness of the other occurrences, apparently did not consider the one we have mentioned as worthy of notice.

In People v. Golsh, 63 Cal. App. 609, 219 P. 456, where there was a conviction of first degree murder, "a jurywoman was seen talking to the father of the deceased in a highly excited manner and gesticulating violently." The Court of Appeals said:

"It does not appear that the conversation related to the case on trial. It therefore is not of itself a circumstance sufficient to raise a presumption that the juror was improperly influenced. It was of course a grave impropriety, exposing the juror to suspicion and reflecting upon the administration of justice, but in the absence of any showing as to the nature of the subject-matter of the conversation we cannot say that it was legal misconduct calling for a reversal of the judgment."

In State v. Guy, 121 Wash. 534, 209 P. 673, a juror, separated from the others, while sitting on a bench in a corridor outside the courtroom, during a recess, was joined by, and engaged in conversation with, one of the state's witnesses. The Supreme Court, being satisfied from the consideration of affidavits, in some respects conflicting, that the conversation did not relate to the cause on trial nor affect the juror's judgment or deliberation, refused a new trial.

In Fitzpatrick v. State, 149 Ga. 75, 99 S. E. 128, another murder case, the showing on motion for new trial was to the effect that a juror separated himself from

his fellows, went a considerable distance, not in company with an officer, entered the house of one Cox, and conversed with him. It appearing by counter affidavit that Cox was the keeper of the courthouse and that the juror went to his house to get the courthouse keys, so that the jury might gain admittance to resume their deliberations, and that nothing was said about the case except a question by Cox as to whether the jury had agreed on a verdict, to which the juror made no reply, the court denied a new trial.

Appellant relies upon State v. Hunt, 26 N. M. 160, 189 P. 1111, as analogous in its underlying principle. That decision involved a communication between the judge and a juror relating to a proceeding in the case. It was held that, in such a case, prejudice need not be shown. The decision was based upon the right of the accused to be present during all proceedings. It is urged that the strict rule adhered to in the Hunt Case, supported, as was there indicated, by practically unanimous authority, is inconsistent with the comparative liberality of the authorities above referred to when dealing with communications with outsiders. However that may be, it is evident that the two classes of cases involve different principles and that the results have been reached from different considerations. The great influence of a communication from the judge regarding the case is manifest. No such influence attaches presumptively to a communication from an outsider, particularly when it has no reference to the case.

We cannot admit, therefore, that it is the law of this state that the bare fact of an unauthorized and improper communication necessitates in all cases a new trial, even in capital felonies. When it appears that there has been such communication, the important question is whether prejudice has resulted. Such a communication certainly requires explanation, not only to secure the accused in his rights, but to maintain the court's authority. But if it satisfactorily appears that the communication was harmless and had no effect on the verdict, the rights of the accused do not require,

and public interest does not permit, the granting of a new trial. So we dispose of appellant's contention to the effect that a conclusive presumption of prejudice arises in such a case as this. The question remains whether such presumption of prejudice as arose upon the appellant's showing has been satisfactorily rebutted.

It is to be admitted that the denial in the counter affidavit is not wholly satisfactory. It would be much better if the communication which took place had been explained in detail, so that the trial court, and this court, instead of the affiant, might have drawn the conclusion as to whether it related to the case. We think, however, that the sweeping nature of the denial is attributable to, and excusable because of, the indefinite nature of the charge. Appellant's showing is more remarkable for what it fails to disclose than for what it reveals. The time is fixed only by naming the date. The place is not mentioned. The name of the offending juror is not stated. The nature of the conversation is said to be unknown. It is disclosed only that the offending third person took an unknown juror to one side and talked to him about 20 minutes. Where did he take him? Was it in the courtroom, the corridors of the courthouse, on the street? Was it in public view? Where were the bailiff and the other jurors? Was the misconduct reported to defendant's counsel? If so, why was it not reported to the court? The answers to these questions would have thrown light on the subject of investigation and brought out the facts. Most of them could have been shown. The time and place could have been fixed. The identity of the juror could have been established. It could have been shown whether, in addition to being private, the conversation was seemingly secret and clandestine, and whether it was apparently earnest and important or merely casual.

An affidavit so general as this was held, in a well-considered case (State v. Cotts, supra), not worthy of being received. The West Virginia Supreme Court said, in that case, that such facts should have been

stated as would have enabled the prosecution to follow up, identify, and explain the fact or contradict the testimony; and it cited Cornelius v. State, 12 Ark. 810, to the effect that the offending jurors should be named, ''for, without that information, the state could not have negatived the presumption of influence.'' In United States v. Cook, supra, the Territorial Supreme Court held that an allegation, on information and belief, that, while separated, the jurors heard the case discussed, should not be considered.

If it be suggested, as an excuse for failing to identify the offending juror, that his affidavit could not have been received to impeach the verdict (a question we do not decide), it may be answered that it could have been received to rebut the presumption of prejudice. Nicholson v. State, 18 Wyo. 298, 106 P. 929; State v. Cotts, supra.

Another matter impresses us. Both appellant and the State, so far as the record discloses, stood on the affidavits we are considering. There was apparently no request for an opportunity to cross-examine Mr. Hill or otherwise that a full investigation be had. The trial court evidently took the counter affidavit as a denial that any communication had taken place. The record does not disclose that counsel in any way called the attention of the court to his error, or pointed out the real effect of the denial. Although written exceptions were filed to the findings, there was no exception whatever to the finding in question.

An application for a new trial, particularly in a criminal cause of this gravity, is a matter of serious moment. Its decision involves grave responsibility. Every safeguard should surround the right of an accused person to a fair trial and to a verdict based on the evidence alone. On the other hand, new trials for purely technical reasons are against public interest. It is the duty of the court to award them for the correction of misconduct prejudicial to the accused. It is also the duty of the court to protect the administration

of public justice against abuse. To adopt the rule contended for here would render it easy for one in a desperate situation involving his life to procure some act to be done which, as matter of law, would invalidate an unfavorable verdict. To allow high presumptive force to such a showing as is here made would lend encouragement to those who would profit from getting technical misconduct into the record, and tend to discourage a full and honest showing on the meritorious question of prejudice.

So we think that the presumption of prejudice raised by the appellant's meager showing is slight, and that it is satisfactorily rebutted by the general denial of any communication, with any juror, having relation to the case. We mention counsel's failure to except to the court's finding, not as intimating that, for lack of exception by counsel, we should permit the execution of a tainted judgment in a capital case, but because of the inference readily to be drawn, in connection with the other facts mentioned, that the court's misapprehension of the effect of the counter affidavit was deemed more advantageous to appellant than the correction of it.

Our careful consideration of this case leads us to the conclusion that appellant was not entitled to a new trial because of the communication complained of.

It is strongly urged that we incorrectly disposed of appellant's contention of error as to the remark of the assistant district attorney, construed by counsel as a comment on appellant's failure to testify. We are unconvinced, however, and do not think it necessary to modify what we heretofore said.

The full reconsideration which we have given this case, aided by the able arguments and briefs of learned counsel, discloses nothing to warrant a reversal of the judgment, and we are constrained to adhere to the affirmance thereof.

PARKER, C. J., and BICKLEY, J., concur.